UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: GENIE INVESTMENTS NV INC., Debtor.
CHARLES BLAKE STRINGER and
NUTRA-ACRES, LLC,
Plaintiffs,
v.
GENIE INVESTMENTS NV INC.,
Defendant.
Case No.: 3:24-bk-00496-BAJ
Chapter 7
Adv. Pro. No.: 3:26-AP-00063-BAJ

FILED INTAKE USBC
JUN 1 '26 PM2:05

**VERIFIED NOTICE OF NON-PARTY STATUS AND OBJECTION TO ANY DEFAULT JUDGMENT PURPORTING TO BIND NON-PARTY FORMER REPRESENTATIVES/PRINCIPALS AND STATEMENT REGARDING THE PONZI SCHEME ALLEGATION**

COMES NOW John Michael Cohan, a protected person, equity holder of the Debtor, former Debtor representative/principal and **non-party** to this adversary proceeding, and states as follows:

I. Non-Party Status and Due Process

1. The Complaint in this adversary proceeding (Doc. 1) requests that the Court render a declaratory judgment "that the Debtor operated a Ponzi Scheme <u>by and through its principals</u> and its insider/affiliated companies, which declaration shall apply to all legal proceedings relating to the Debtor and the operation of the Ponzi Scheme."

2. John Michael Cohan is a former representatives/principals of the Debtor and of the affiliated companies.

3. The bare-bone Complaint does not formally name John Michael Cohan as a defendant, but was referenced in passing in paragraph 6 of the complaint ("by and through its principals"). He has not been served. He has not appeared. He has not consented to the jurisdiction of this Court over his person.

4. Notwithstanding the foregoing, the Complaint expressly seeks a judgment that would purport to bind him personally.

5. The Fifth Amendment guarantees that no person shall be deprived of life, liberty, or property without due process of law. As a general rule, a court may not bind a nonparty who was not served, not made a party, and not given notice and an opportunity to be heard. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969); *Taylor v. Sturgell*, 553 U.S. 880 (2008).

6. John Michael Cohan does not consent to any default judgment that purports to bind him personally or to declare the ridiculous position that he operated a Ponzi scheme.

7. He takes no position on the Trustee's decision to defend or not defend the Debtor. He does not seek to intervene unless absolutely necessary. He does not seek to become a party. He files this notice solely to protect his own due process rights and to create a record that he does not acquiesce to any judgment that would bind him without a trial. He will happily provide any testimony at any trial or hearing, if any, as he has done here, if required.

8. This notice is not a general appearance. It is a limited objection to any proposed judgment that would bind a non-party. Filing this notice does not waive any rights John Michael Cohan may have to challenge any judgment in any other proceeding, including the right to argue collateral estoppel does not apply because no issue was actually litigated.

## II. The Debtor Was Not a Ponzi Scheme and Stringer's Allegations Are False

9. The undersigned takes a definitive position: The Debtor was not a Ponzi scheme. Stringer's adversary proceeding is legally flawed and factually unsupported.

10. The Debtor actually made loans from capital it owned per the underlying agreements. A Ponzi scheme requires that money from new investors is used to pay returns to old investors, with no legitimate underlying business. That did not happen here. The Debtor operated a lending business. It executed loan agreements. It disbursed funds to borrowers from its own capital reported on its schedules (**EXHIBIT A**). It had refundable and non-refundable payment categories, clearly disclosed in every contract.

11. Stringer was in the **non-refundable** category. His contracts (**EXHIBIT B**) expressly stated:

Due Diligence Agreement

· Wiring Instructions: "*This fee for Due Diligence is 100% **non-refundable**.*"

· Section 2: "2. Payment...As a material inducement to Company to commence the Services, the Borrower shall pay Company a non-accountable and **non-refundable fee** of Twenty-Five Thousand Dollars ($25,000), payable prior to commencement of the Services. Payment of the diligence fee is not a guarantee that Company will offer funding to Borrower, or that any offer will be on terms and conditions acceptable to Borrower.... This interest of this Bridge Loan is **100% nonrefundable**."

Bridge Loan Agreement

· Section 2.03(b): "(b) Payment of Interest. Pre-paid interest on the outstanding principal amount of the Loan shall be paid in kind and capitalized on this Business Day and shall be paid in cash in full upon acceptance of this agreement. **Borrower understands that this payment is fully non-refundable**."

12. There was no promise of a return. There was no "money in, money out" cycle. There was a loan that did not fund. That is a failed contract, not a Ponzi scheme.

13. Stringer was not even dealing directly with the Debtor. He worked through McMann Commercial Lending LLC ("McMann"), a third-party reseller. Whatever McMann told Stringer, the Debtor did not authorize. The Debtor cannot be held liable for alleged misrepresentations made by an independent third-party reseller. Stringer's remedy, if any, is against McMann—not the Debtor, and certainly not the equity holders of the Debtor.

14. Stringer admitted under oath at the April 9-10 2024 trial that he did "not know who Genie was" before he engaged. That alone defeats any claim of reasonable reliance on representations by the Debtor.

15. Stringer's own business decisions do not create a claim against the Debtor. Upon information and belief, Stringer admitted that he borrowed money from other lenders to fund his prepaid interest payment to the Debtor. He admitted that he leveraged his farm to do so. He admitted that he lost his farm when the loan did not fund. These were *his* choices. The contract expressly stated the payment was "100% non-refundable" and "not a guarantee of funding." No one forced Stringer to borrow money from third parties. No one forced him to bet his farm on a non-refundable payment with no guarantee of funding. He made a calculated business decision. It did not work out. That is not fraud, not a Ponzi scheme, and not a valid claim against the estate. A party cannot knowingly assume a contractual risk, lose the gamble, and then sue for damages as if the risk never existed.

16. Stringer violated his own contract provisions. Stringer signed agreements containing clear confidentiality and non-disparagement clauses. Stringer then posted publicly (pre and post petition, and post conversion) on BiggerPockets, Trustpilot, Yelp, and other platforms, calling the Debtor a "scam," a "Ponzi scheme," and naming the undersigned as a "criminal." He cannot now seek damages from a contract he himself breached. Under basic contract law, a party who

materially breaches a contract cannot recover against the other party for non-performance. Stringer's own conduct bars his claim.

17. The Due Diligence Fee Agreement contains a mandatory indemnification clause. Section 5 of the Due Diligence Fee Agreement (attached as **EXHIBIT B**; Bankr. Doc. 513) states:

"Borrower shall indemnify Company against any cost, loss, expense or liability which may be suffered or incurred by Company ... arising from any misrepresentation, misconduct, negligence or dishonesty on the part of any third party."

Stringer is the Borrower. The Debtor is the Company. Stringer recruited third parties to post defamatory reviews, file false FBI complaints, and harass the Debtor and its former representatives/principals. Any loss the Debtor suffered from that misconduct is Stringer's liability, not the other way around. Stringer cannot seek damages from a contract that requires him to indemnify the other party for the very harm he caused.

18. The Bridge Loan Agreement contains an even broader indemnification clause that protects the undersigned personally. Section 10.03 of the Bridge Loan Agreement (attached as **EXHIBIT B**; Bankr. Doc. 513) states:

"Borrower does hereby release and indemnify Lender and hold Lender and its officers, directors, employees, and agents harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the Bridge Loan by Borrower or its agents."

Stringer is the Borrower. The Debtor is the Lender. The undersigned is an officer and director of the Lender. Stringer's conduct — including defamation, conspiracy, and false light — constitutes a misapplication and misuse of the Bridge Loan proceeds. Under the plain language of Section 10.03, Stringer is required to indemnify the undersigned personally, not the other way around.

His claim against the estate — and any claim he might bring against the undersigned personally — is, or at least should be, barred.

19. The undersigned was not named as a defendant for a reason. Upon information and belief, the Plaintiff did not name the undersigned as a defendant in the adversary proceeding because the Plaintiff knows — or should know — that his claims would not survive actual adversarial scrutiny. The Plaintiff cannot hide behind a default judgment against an entity while avoiding the due process rights of a non-party principal. The undersigned was not named precisely because the Plaintiff knows the indemnification clause in Section 10.03 bars any claim against the undersigned personally and that his arguments, when evidence is presented, do not hold a drop of water.

20. Stringer's own actions have eviscerated his standing and credibility. Stringer is a serial bankruptcy offender. It was established on the record during the April 9-10, 2024 trial that Stringer has been in and out of bankruptcy. He is a sophisticated repeat player who understands the bankruptcy system. He cannot credibly claim to have been defrauded or to have reasonably relied on any representation when he is an experienced bankruptcy filer who knew — or should have known — the risks of signing a contract with "100% non-refundable" and "not a guarantee of funding" language. Stringer's bad faith is not an opinion — it is a documented fact that this Court can and should take judicial notice of.

III. The Debtor Did Not Solicit Stringer or Any Customer

21. Stringer alleges that the Debtor solicited customers. That is false. The Debtor did not solicit anyone. Every customer — including Stringer — applied to the Debtor through McMann Commercial Lending LLC, a third-party reseller, or through their own entity. They applied

through the Zoomeral portal. Zoomeral Inc. was a separate entity. The Debtor did not control who applied. The Debtor did not reach out to Stringer. Stringer reached out to the Debtor through McMann.

22. Again, Stringer admitted under oath at the April 9-10, 2024 trial that he did "not know who Genie was" before he engaged. He cannot claim he was solicited by someone he never knew. He cannot claim he relied on representations from a company he admits he never heard of before applying. The undisputed record shows that the Debtor was a passive recipient of applications, not an active solicitor of customers.

IV. The Default Judgment Stringer Relies Upon Is Not a Finding on the Merits

23. The default judgment referenced in paragraph 22 of Stringer's complaint was entered against companies that ran out of money and could not defend themselves. It is not a finding on the merits. It does not establish that the Debtor operated a Ponzi scheme. It does not bind non-parties. (See 25-ap-00011, Notice of Material Change, Doc. 20, filed in or around March 2025)

24. The Chapter 7 Trustee has reviewed the bank account statements of those companies during post-judgment discovery and has taken no further action against them. The Trustee has not disputed that all funds were spent according to the business plans attached to the loan agreements. The business plans attached to the loan agreements show that all funds were spent exactly as disclosed. The Trustee has never disputed that the expenditures matched the business plans.

25. Moreover, all payments made to the Debtor were owned by the Debtor, free and clear, to be used as capital to carry out the services the Debtor was providing — which was making loans.

Not everyone got a loan. That is not fraud. That is life. A failed wholesale lender, nor a failed contract, is not a Ponzi scheme.

26. The Trustee testified that he did not review bank records before asserting avoidance claims and instead relied on third parties (Bankr. Doc. 389 at 39:19–25, 40:4–8, 41:19–23, 58:14–17). That testimony bears on whether he conducted an adequate investigation of the debtor's financial affairs under 11 U.S.C. § 704(a)(4). But a default judgment on fraudulent-transfer claims is not, by itself, a judicial determination that the Debtor operated a Ponzi scheme.

V. The UST's Allegations — Adopted by Stringer — Are Unsupported by the Contracts and Based on a False Premise

27. The UST's motion to appoint a trustee (Bankr. Doc. 20) alleged that Genie was a fraudulent enterprise that "simply stole" money from customers and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. The UST based these allegations solely on statements from 18 small-business owners — the same pool of disgruntled borrowers from third-party reseller, McMann Commercial Lending LLC, which Stringer emerges.

28. The Walker Declaration (Exhibit to Bankr. Doc. 34), sworn testimony from a former FINRA enforcement lawyer of 12 years, establishes that the Debtor relied in good faith on legal counsel from a well-regarded law firm. Walker stated:

"Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment." (Bankr. Doc. 34, Page 6).

A company that seeks, pays for, and relies on professional legal advice cannot be said to have acted with fraudulent intent.

29. Moreover, the legal analysis (prepared by Walker) of the Examiner's Report (Bankr. Doc. 146), which did not find fraud, correctly identifies the fatal flaw in the UST's position: the BELOC Agreement does not require ICA Payments to be held in trust. The Report offers no analysis of the relevant contract provisions. It never acknowledges that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. Instead, the Report cites emails from interested parties — McMann's principal, McMann's law firm, and one borrower affidavit — to override the unambiguous language of the contract.

30. The first UST's motion was largely denied. The Court appointed only an Examiner and allowed the Debtor to remain in possession. The UST's core allegation — that Genie "simply stole" customer money — was never substantiated because the contracts say the opposite. As Adam Walker, a former FINRA enforcement lawyer of 12 years, documented the UST's:

'express purpose' allegation of fraud was 'itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.' (**EXHIBIT F**).

31. Stringer now parrots the UST's debunked allegations. He cannot point to any contract provision requiring his payment to be held in trust. He cannot point to any contract provision making his payment refundable. His own Response to the Trustee's Objection admits the payment was for "prepaid interest and fees" (Bankr. Doc. 581 ¶ 6). Under Bridge Loan Agreement Section 2.03(b), that payment is "fully non-refundable."

32. Stringer cannot succeed where the UST failed. The UST — a representative of the Department of Justice — could not prove fraud because the contracts say the opposite. Stringer cannot overcome the plain language of the contracts he signed. The UST admitted that the Debtor [unknowingly] sent funds to a company that operated like a Ponzi scheme (1:25-cv-

02009, ECF No. 18 at 9)— but that does not make the Debtor a Ponzi scheme. It means the Debtor was a victim, not the perpetrator.

IV. Stringer's Ponzi Scheme Allegations Fail Under All Three (3) Legal Tests

33. The Stringer Complaint (Adv. Pro. Doc. 1) alleges three (3) separate tests for a Ponzi scheme. Even assuming arguendo that the Debtor's conduct satisfied the first test (which it does not), the second and third tests independently fail on the facts and the law.

34. Before addressing the specific tests, three (3) threshold facts must be stated clearly: First, Stringer did not make "deposits." Stringer made contractual payments of pre-paid interest and fees pursuant to signed Due Diligence and Bridge Loan Agreements. The distinction is dispositive. A Ponzi scheme requires "investors" who make "deposits" in expectation of returns. Stringer was a borrower. He paid pre-paid interest. The Bridge Loan Agreement Section 2.03(b) expressly states this payment is "fully non-refundable." Stringer admits this in his own Response to the Trustee's Objection to his claim (Bankr. Doc. 581 ¶ 6):

"The Creditors agree that the sum of $400,000 was paid to the Debtor by the Creditors prepaid interest and fees."

35. Second, the Debtor made actual loans from capital it owned per the underlying agreements. The Debtor was not dependent on a circular flow of new customer funds to make payments. It disbursed its funds to borrowers. It operated a legitimate lending business with its own balance sheet.

36. Third, and most critically, there were no "investor funds" to commingle. The $400,000 Bridge Loan principal was the Debtor's own capital, held in Genie's account pursuant to Bridge Loan Agreement Section 2.02(a). The $400,000 Stringer paid was pre-paid interest — a

contractual payment for the use of the Debtor's capital. That payment was earned by the Debtor under Bridge Loan Agreement Section 2.03(b) and was expressly "fully non-refundable." Because the payment was contractual consideration for a service actually provided (the Bridge Loan being made available, as established during the April 9-10, 2025 trial (**EXHIBIT B**, *this exhibit was partially admitted into evidence at trial and the Bankruptcy Court did not find fraud*), there was nothing to commingle. The Debtor cannot commingle its own capital with itself. The BELOC loan did not close because of a failed wholesale lender.

37. These three (3) facts alone defeat the Ponzi scheme allegation. A Ponzi scheme, by definition, requires that payments to earlier participants be derived from funds contributed by later participants — not from owned capital or legitimate business operations. Ponzi scheme requires funnel[ing] money from new investors to pay existing investors. Where a debtor makes loans from its own capital, and where the claimant made contractual non-refundable interest payments rather than "deposits," the essential predicate for a Ponzi scheme is absent.

VI. The Four-Factor Test (Complaint ¶ 25)

38. The four-factor test requires: (1) deposits were made by customers; (2) the debtor conducted little or no legitimate business operations as represented; (3) the purported business operation produced little or no profits or earnings; and (4) the source of payments to customers was from cash infused by new customers.

39. Factor (1) fails as a matter of fact and law. Stringer made contractual payments of pre-paid interest and fees — not "deposits." The use of the word "deposits" is a deliberate attempt to recast a failed loan transaction as an investment scheme. The Court should reject this artifice.

40. Factor (2): The Debtor conducted legitimate business operations. The Debtor executed loan agreements, disbursed funds to borrowers from capital it owned, collected payments, and operated a lending business. The existence of failed loans does not transform a legitimate lending operation into a Ponzi scheme. A business can fail without being a fraud.

41. Factor (3): The Debtor's business produced earnings. The non-refundable fee structure, clearly disclosed in every contract, generated revenue. The fact that the Debtor ultimately became insolvent does not mean it never produced profits or earnings during its operations.

42. Factor (4): The source of loans to customers was not from new customer funds. The Debtor made actual loans from capital it owned. Stringer has alleged no specific instance where Customer A's fees were used to pay Customer B. Conclusory allegations are insufficient to establish a Ponzi scheme.

VII. The Seven-Badge Test (Complaint ¶ 26)

43. The seven-badge test requires: (1) absence of legitimate business; (2) unrealistic promises of low risk; (3) commingling; (4) use of agents/brokers paid high commissions; (5) misuse of funds; (6) excessive fees to perpetrator; (7) false financial statements.

44. Badge (1) — absence of legitimate business: The Debtor operated a legitimate lending business using capital it owned. The existence of forty-four (44) contractual BELOC loan agreements, actual disbursement of funds to borrowers, a structured fee model negates this badge, and transactions that Chapter 7 Trustee is now collecting on.

45. Badge (2) — unrealistic promises of low risk: The contracts did not promise "low risk" or any guaranteed return. To the contrary, every due diligence contract expressly stated: "Payment

of the diligence fee is not a guarantee that Company will offer funding." Stringer cannot claim unrealistic promises when the contract disclaimed any promise at all.

46. Badge (3) — commingling: Commingling of funds, without more, is not evidence of a Ponzi scheme. Many legitimate businesses commingle funds in operating accounts. Stringer has alleged no specific facts showing commingling was fraudulent rather than ordinary business practice. Moreover, as aforementioned above, there were no "investor funds" to commingle. The Bridge Loan principal was the Debtor's own capital. The interest payment was contractual revenue earned by the Debtor. The Debtor cannot commingle its own capital with itself. The commingling badge therefore fails as a matter of basic logic.

47. Badge (4) — agents/brokers paid high commissions: The use of brokers (McMann, Soteria, Second Chance) does not establish a Ponzi scheme. Real estate, lending, and financial services industries routinely use commissioned brokers. Stringer has alleged no facts showing commissions were "excessively high" or that the broker structure was designed to perpetuate fraud rather than generate legitimate business. Critically, Stringer dealt directly with McMann — an independent third-party reseller, not a broker for the Debtor. Any alleged representations or misrepresentations by McMann are not attributable to the Debtor, its former representatives/principals or their affiliated companies.

48. Badge (5) — misuse of funds: Misuse of funds is alleged but not proven. Stringer's complaint is devoid of specific facts showing where funds went or how they were misused. Conclusory allegations of "misuse" do not satisfy pleading standards.

49. Badge (6) — excessive fees to perpetrator: Stringer has not identified any "perpetrator" or alleged specific excessive fees. The non-refundable fee structure was disclosed in every contract.

A disclosed, agreed-upon fee for a specific service (the Bridge Loan) cannot be "excessive" as a matter of law, especially when Stringer admits the payment was for "prepaid interest and fees" (Bankr. Doc. 581 ¶ 6).

50. Badge (7) — false financial statements: Stringer alleges no specific false statement, no specific document, and no specific misrepresentation. This badge is pleaded entirely without factual support. In fact, his complaint contains no exhibits and no citations to reference in support of Stringer's [false] allegations.

51. Because Stringer cannot satisfy the second or third tests, and because his fundamental premises — that he made "deposits" as an "investor," that the Debtor lacked its own capital, and that there were funds to commingle — are false as a matter of fact and law, the request for declaratory judgment that the Debtor operated a Ponzi scheme undoubtedly fails. The undersigned reiterates: The Debtor was not a Ponzi scheme. It was a failed lending business that made actual loans from capital it owned. A wholesale lender failed to fund as promised. Failure is not fraud.

VIII. Stringer Is Not a Victim – He Is a Participant in Tortious Conduct

52. Stringer is not a victim of anything. He is an active participant in a campaign of tortious conduct against the Debtor and its former representatives/principals and their former companies (**EXHIBIT C**) that the Chapter 7 Trustee did not "believe at this point on the limited information that I have those causes of action are property of the estate" and that it was "outside the scope" of the hearing (Bankr. Doc. 389, Transcript Pages 31-33) despite the filing incorporating evidence of this campaign being "erroneously" struck, then placed back on the record, but only after the Chapter 7 Trustee successfully avoided responding to the merits of the court-ordered

response brief which included Stringer's defamation for said hearing while violating the court's instructions and basic procedure by filing two (2) replies. (Bankr. Docs. 317, 355, 356, 357, 359, 360, 361)

53. Stringer created a website (https://www.victimsbelocscam.com) and posted on various platforms specifically designed to defame, harass, and extort the Debtor and its former representatives/principals and their former companies, which eventually required intervention by the Chapter 7 Trustee (**EXHIBIT D**) for Stringer's *pre and post-petition* conduct and demonstrating that the Chapter 7 Trustee was well aware of the causes of action that were property of the estate and is seemingly in breach of his fiduciary duties to protect the estate. For example, Stringer posted on BiggerPockets forums (https://www.biggerpockets.com/forums/49/topics/1081636-mcmann-commercial-lending) claiming the Debtor was a 'Ponzi scheme' and 'scam.' He posted on Trustpilot (https://www.trustpilot.com/review/zoomeral.com) calling the undersigned a 'criminal.' He posted on Yelp, the Better Business Bureau, and victimsbelocscam.com, a website Stringer himself created, all making the same false allegations. Post conversion, Stringer created social media posts on 'Merkton Group''s page to further his defamation campaign.

54. Stringer engaged in civil conspiracy, defamation, and false light amongst other claims against the Debtor, its former representatives/principals, their former companies and the undersigned. This adversary complaint is an extension of the same campaign.

55. Upon information and belief, Stringer created a fake online persona, "Sandra Tate," to further his tortious campaign. The name "Sandra Tate" is not on any schedule, claim or in any of the Debtor's records.

56. On August 8, 2024, the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County (No.: 2024-008427-CA-01), Florida entered default judgments against Kristen Stegent (Rolling by the Dozen LLC) and Kipp Nash a/k/a Kim Nash (A-Complete Home Inspection LLC) for defamation, conspiracy, extortion, and other tortious conduct substantially similar, if not identical, to Stringer's conduct. **(EXHIBIT E)**

57. Stringer was the ringleader of this conspiracy, or at the very least, he was certainly the most vocal online. He organized, encouraged, and participated in the same defamation campaign that resulted in default judgments against his co-conspirators. He cannot now claim to be a victim of the same entity he conspired to destroy.

58. Under the doctrine of unclean hands, a claimant who has engaged in fraud, conspiracy, defamation, and other inequitable conduct against a debtor and its former representatives/principals should not be permitted to recover anything from the estate. Stringer's claim should be disallowed in its entirety, and he should not be permitted to use an adversary proceeding to extract money from the Debtor or its former representatives/principals.

59. Stringer continued his harassment post-petition. On November 25, 2024, the undersigned emailed the Debtor's counsel documenting Stringer's ongoing stay violations, including continued defamatory posts and harassment of the estate and its representatives. **(EXHIBIT D)** Stringer has willfully violated the automatic stay and continues to pursue a vendetta against the Debtor and its former representatives/principals.

IX. A Default Judgment Cannot Bind a Non-Party

60. Even if Stringer obtains a default judgment against the Debtor (an entity with no incentive to defend), that judgment has no preclusive effect on the undersigned.

61. Under federal preclusion law, issue preclusion generally does not apply to a default judgment because the issues were not actually litigated. See, e.g., *In re O'Quinn*, 401 B.R. 739 (Bankr. M.D.N.C. 2009). In the Eleventh Circuit, collateral estoppel requires that the issue have been actually litigated and determined. *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309 (11th Cir. 2003).

62. Stringer cannot use a default judgment against the Debtor without naming the undersigned to bind the undersigned in any other proceeding. Due process prohibits it.

63. The undersigned does not consent to any judgment that purports to bind his reputation or personal interests. This notice is filed to ensure the record reflects that the undersigned denies the Debtor was a Ponzi scheme and does not accept any finding that would prejudice his interests.

X. The Adversary Proceeding Does Not Salvage Stringer's Underlying Claim

64. Stringer is entitled to pursue his adversary proceeding against the Debtor. But that proceeding does not—and cannot—cure the fatal defect in his underlying Proof of Claim (Claim #5).

65. The contracts expressly state that all fees are "100% non-refundable" and that payment [not a "deposit" as Stringer claims] "is not a guarantee of funding." Under that plain language, Stringer is entitled to nothing from the estate.

66. The adversary proceeding is a distraction from that dispositive fact. No declaration of a Ponzi scheme can rewrite unambiguous contract language.

## XI. The Trustee's Silence and the Muse Agreed Order Confirm the Trustee Does Not Believe the Debtor Operated a Ponzi Scheme

67. The Trustee recently entered into an agreed order with another claimant, Belle Maison Realty, LLC (Bankr. Doc. 583, Claim #4)). That agreed order allowed her claim for $70,000. It did not declare the Debtor a Ponzi scheme. It did not find fraud. The Trustee knows how to settle when he agrees with the outcome. He has not entered into any agreed order with Stringer declaring the Debtor a Ponzi scheme. He has not filed his own adversary proceeding seeking such a declaration. Regardless of whether the Trustee decides to defend this frivolous action or not, the only reasonable inference, based on the record, is that the Trustee does not believe the Debtor operated a Ponzi scheme. His silence—coupled with his willingness to settle with Muse on terms that expressly avoided any Ponzi scheme finding—speaks volumes. This Court should draw the same inference.

VERIFICATION

68. I, John Michael Cohan, declare under penalty of perjury that the facts stated in the foregoing Notice and its attachments are true and correct.

69. WHEREFORE, John Michael Cohan respectfully demands that:

· This notice be entered on the docket;

· The Court take no action that would bind him personally without first providing him with proper notice and an opportunity to be heard;

· Any default judgment entered in this adversary proceeding explicitly state that it does not bind non-party former representatives/principals or any party not named as a defendant and served;

· Find that Stringer's adversary complaint (Adv. Pro. 3:26-ap-00063) was filed in bad faith and for an improper purpose; and

· Such other relief as the Court deems just and proper.

Dated: 06-01-2026

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103
iustusprocessus@outlook.com

### Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the following documents by the CM/ECF system and/or email.

Key: "Doc." or "Docs." = filings entered into this case unless otherwise specified
    "Bankr. Doc." or "Bankr. Docs." = filings entered in 3:24-bk-00496